306 Ga. 38
FINAL COPY

S19A0172.  RIGSBY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Johnny Rigsby was convicted of malice murder and other crimes in connection with the shooting death of his girlfriend Betty Smith. Appellant contends that the trial court erred by failing to suppress his post-arrest statement to an investigator, that the jury instructions and verdict form regarding the lesser offense of voluntary manslaughter were improper, and that his trial counsel provided ineffective assistance by failing to timely object to the verdict form. We affirm.[1]

---

[1] Smith was killed in September 2010. On October 3, 2011, a Spalding County grand jury indicted Appellant for malice murder, felony murder, aggravated assault involving family violence, aggravated cruelty to animals, possession of a firearm during the commission of a crime, and possession of a controlled substance. The trial court later entered an order of nolle prosequi on the controlled substance charge. At a trial from August 13 to 16, 2012, the jury found Appellant guilty of all charges. The trial court sentenced him to serve life in prison without the possibility of parole for malice murder, a 20-year concurrent term for family violence aggravated assault, a five-year concurrent term for aggravated cruelty to animals, and a five-year consecutive term for the firearm offense. The felony murder count was vacated by operation of law.

1.	Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. Around 2:30 p.m. on September 4, 2010, a City of Griffin police officer responded to a report that a man in a Toyota Camry was driving recklessly. The officer located the Camry, which belonged to Smith, at a gas station. Appellant was in the driver's seat rolling a marijuana cigarette, and his pet ferret was also in the car. The officer searched Appellant and found a .38-caliber revolver with two spent rounds in it. Appellant was then arrested, and his grandmother Mary Sampler picked up the Camry and the ferret and drove to Smith's house in Spalding County, where Smith and Appellant lived together. At the house, Sampler knocked on the front door, and when there was no answer, she dropped off the car keys just inside the unlocked door. Sampler then paid Appellant's bail, and he was released from custody. Around 6:00 p.m., she

Appellant filed a timely motion for new trial, which he later amended with new counsel. After an evidentiary hearing, the trial court denied the motion on August 17, 2017. Appellant then filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2018 and submitted for decision on the briefs.

dropped him and the ferret off at his and Smith's house. Appellant told Sampler that Smith was ill, and Sampler left without entering the house.

Later that night, a deputy sheriff responded to another report about Appellant's reckless driving in Smith's car, this time in Lamar County, and he was arrested again and held in jail there. The next day, Sampler tried to call Smith about Appellant's arrest, but there was no response. On the following morning, September 6, Sampler went to Appellant and Smith's house and knocked on the front door. When Smith did not answer, Sampler tried to open the door, but it was locked. Sampler went to the house again on September 7 and again received no response to her knocking. Later that evening, she and her daughter asked the sheriff's department to check on Smith.

Around 10:00 p.m., Spalding County sheriff's investigators who responded to the house found Smith's dead body, along with her dead pet ferret, in a large chest in her bedroom.[2] Smith had been shot twice — once on the right side of her head and once between

---

[2] Appellant and Smith each owned a pet ferret.

her eyes. Investigators found a large pool of blood to the right of the bedroom door, a wad of bloody hair, and markings on the carpet "as if someone were clawing" the floor. In a toilet in the bathroom, investigators found blood and hair.

In the kitchen, the investigators found a bloody knife, a bloody pair of scissors, and blood on the walls, cabinets, counters, and floor. Testing later showed that Appellant's fingerprint was on the knife and that the blood on the knife, the scissors, a kitchen wall, and a counter belonged to an animal. Investigators determined that the blood spatter in the kitchen was consistent with cutting an animal and then swinging it around and slamming it against the cabinets. In the living room, investigators found a cage that contained Appellant's pet ferret, the empty box for the revolver Appellant had been carrying when he was arrested on September 4, and another pair of bloody scissors. DNA testing later showed that the blood on those scissors came from Smith. Investigators also found two cell phones in the living room. The last call made from one of the phones was to a friend of Smith's at 12:19 p.m. on September 4, about two

hours before Appellant was arrested carrying the revolver.

At trial, the State presented evidence that the gunshot wound to the right side of Smith's head was caused by a shot fired from more than two or three feet away and may not have been fatal. The .38-caliber bullet that caused that wound was found in a window frame in Smith's bedroom. The bullet's trajectory indicated that the shooter was standing to the left of the bedroom door. The wound between Smith's eyes was fatal. It was caused by a .38-caliber bullet, which was recovered from Smith's head, fired from less than one half of an inch to three feet away. A firearms examiner testified that both the bullet in the window frame and the bullet in Smith's head had been fired from the revolver that Appellant was carrying when he was first arrested. A medical examiner testified that the manner of Smith's death was homicide. In addition, a crime scene investigator testified that based on lividity in Smith's body, Smith had been put inside the chest after she died.

The State also presented evidence that during a meeting with an investigator two days after Smith's body was found, Appellant

was told that he would be charged with both malice murder and felony murder and that he said, "I only killed – they said I only killed one person." In addition, Appellant's jail cellmate testified that Appellant said that he shot Smith because she was planning to leave him, that he cut her hair, and that he killed her ferret because it would "make him seem insane . . . and he was sure he was gonna get off."

The trial's opening statements and closing arguments were not transcribed, and Appellant did not testify. Some of his counsel's questioning of witnesses suggested a defense theory that Appellant was not present at the time of the shooting. Appellant also elicited testimony from two witnesses that Smith was depressed and had talked about killing herself, and the crime scene investigator testified on cross-examination that Smith had blood on her right hand, which can occur in a suicide by shooting. During re-direct examination, however, the investigator explained that the evidence as a whole was inconsistent with a suicide.

Appellant does not challenge the legal sufficiency of the

evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.    The day after Smith's body was found, an investigator briefly interviewed Appellant, but she stopped questioning him after he asked for a lawyer. The next day, the investigator met with Appellant to complete his booking form for the Spalding County jail. After asking Appellant several biographical questions, she advised him that he would be charged with both malice murder and felony murder. Appellant asked her about the difference between the two

charges, and she explained the basic elements of the crimes without referring to any information in his case. She then told Appellant that she had done her best to explain it and that he should consult with his lawyer. Appellant asked why he would "get two murder charges," and when the investigator replied, "it's standard," he said, "I only killed — they said I only killed one person." The investigator testified about this statement at trial, and a video recording of the meeting during which Appellant made the statement was played for the jury.

Appellant contends that the trial court erred by failing to suppress his statement, because the investigator's explanation of the murder charges was reasonably likely to evoke an incriminating response, was not necessary to complete his booking form, and therefore did not come within the "booking exception" to *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). See *Kirby v. State*, 304 Ga. 472, 476 (819 SE2d 468) (2018) ("Basic biographical questions asked in relation to an arrest are an exception to *Miranda* because such 'booking' questions are unrelated to the investigation

and serve a legitimate administrative need and therefore do not qualify as 'interrogation.'"). The State, however, does not contend that Appellant's statement was admissible under the booking exception; instead, the State asserts that the statement was a spontaneous, voluntary outburst. The State made the same argument to the trial court, and the court admitted the statement on that ground. We see no error in the trial court's ruling. See *Thompson v. State*, 295 Ga. 96, 103 (757 SE2d 846) (2014) ("Whether a statement was the result of interrogation or was instead volunteered is a question of fact for the trial court . . . .").

When a suspect makes an unsolicited statement without being questioned or pressured by an officer, the statement is admissible, even after the suspect has invoked his right to counsel. See *Kirby*, 304 Ga. at 476-477. After Appellant asked for a lawyer, the investigator had an obligation to stop interrogating him about Smith's murder, and the investigator complied with that duty. During the booking procedure the next day, however, Appellant initiated a discussion about the difference between malice and

felony murder, and the investigator merely tried to respond to his questions (while also telling him to consult with his lawyer). The record supports the trial court's finding that the incriminating remark by Appellant that followed was spontaneous and voluntary, not the product of interrogation. The court therefore did not err in admitting the statement into evidence. See *Tennyson v. State*, 282 Ga. 92, 92-93 (646 SE2d 219) (2007) (concluding that the appellant's statement, "I didn't kill that man. He was trying to rob me," after an officer informed him during booking that he was charged with murder, was made spontaneously and therefore properly admitted); *Johns v. State*, 274 Ga. 23, 24 (549 SE2d 68) (2001) (holding that the appellant's statement, "Shouldn't have kept the purse. Should have got rid of it," after an officer informed him of the charges against him, was made spontaneously and voluntarily).

3.    At trial, during the jury charge conference, Appellant's counsel requested an instruction on voluntary manslaughter based on two theories: that Appellant was provoked to shoot Smith when she told him that she planned to leave him; and alternatively, that

Smith attempted to commit suicide by shooting herself in the right side of her head and Appellant then fired the fatal shot between her eyes to assist her suicide. The trial court then charged the jury on voluntary manslaughter as a lesser offense of the malice murder and felony murder counts in the indictment, and the verdict form included a line for a verdict on "Lesser included Voluntary Manslaughter" under the lines for both the verdict on the malice murder count and the verdict on the felony murder count. The jury left the voluntary manslaughter lines blank and wrote "Guilty" on the lines for each indicted count.

Appellant now contends that the trial court's jury instructions in conjunction with the verdict form were confusing and prevented the jury from fully considering voluntary manslaughter verdicts, and that the verdict form was filled out improperly because the jury left blank the lines for voluntary manslaughter. We see no reversible error in these claims, but they fail for a more fundamental reason — Appellant was not entitled to the jury's consideration of a voluntary manslaughter verdict at all.

Voluntary manslaughter is the killing of another person under circumstances that would otherwise be murder when the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a).

> A jury charge on voluntary manslaughter is required only when there is some evidence that the defendant acted in this manner. And it is a question of law for the courts to determine whether the defendant presented any evidence of sufficient provocation to excite the passions of a reasonable person.

*Ware v. State*, 303 Ga. 847, 850 (815 SE2d 837) (2018) (citations and punctuation omitted).

We first consider Appellant's theory that his cellmate's testimony that Appellant said he shot Smith because she was planning to leave him entitled him to a voluntary manslaughter instruction. We have held that the revelation of adulterous conduct (or similar conduct as to unmarried partners), including by the victim's disclosure of such conduct to the defendant, may under some circumstances amount to serious provocation sufficient to excite sudden, violent, and irresistible passion in a reasonable person. See,

e.g., *Brooks v. State*, 249 Ga. 583, 585 (292 SE2d 694) (1982) (concluding that the victim's taunting of the defendant, her husband, with a graphic description of her sexual activities with other men authorized a voluntary manslaughter instruction). But we have consistently held that a victim's statement that she wants to end her relationship with the defendant is insufficient provocation to support a voluntary manslaughter charge. See, e.g., *Ware*, 303 Ga. at 850-851; *Davis v. State*, 290 Ga. 421, 421-424 (721 SE2d 886) (2012). In this case, there was no evidence that Smith ever engaged in or recounted to Appellant any sexual conduct with others. Thus, a jury instruction on voluntary manslaughter was inappropriate on this theory. See, e.g., *Ware*, 303 Ga. at 852.

As for Appellant's alternative claim that he was entitled to the instruction based on his impassioned response to Smith's supposed attempt to commit suicide, he cites no authority to support that argument. Even accepting Appellant's dubious assertion that slight evidence indicated that Smith attempted suicide by shooting herself in the side of her head, and even assuming that witnessing

someone's suicide attempt could — under some exceptional circumstances — provoke a reasonable person to kill her (rather than render her aid), there is no evidence that the circumstances in *this* case would have provoked a *reasonable* person to kill Smith. See *Bailey v. State*, 301 Ga. 476, 480 (801 SE2d 813) (2017) (explaining that we "evaluate the alleged provocation evidence with respect to its impact on a reasonable person, putting aside any peculiar response [the appellant] may have had"). See also *Partridge v. State*, 256 Ga. 602, 603 (351 SE2d 635) (1987) (rejecting the argument by the appellant, who had been found guilty but mentally ill of murder, that "his fragile mental state" should be considered, because "the legislature has prescribed an objective standard for determining when a defendant is entitled to a charge on voluntary manslaughter"); OCGA § 16-5-5 (b) (making it a felony to knowingly and wilfully assist a suicide).

Thus, Appellant was not legally entitled to a jury instruction on voluntary manslaughter based on either of the theories he asserted in the trial court, and we see no other basis for such an

instruction in the trial evidence. The various errors Appellant asserts with regard to voluntary manslaughter in the trial court's jury charge and the verdict form were therefore harmless, as any possibility for the jury to return a verdict on that lesser offense could only have benefitted him. See, e.g., *McGill v. State*, 263 Ga. 81, 83 (428 SE2d 341) (1993) (holding that the trial court's sequential charge related to felony murder and voluntary manslaughter was harmless, because there was no evidence to support the voluntary manslaughter charge so "the jury would not have been [properly] authorized to find that the homicide was an act of voluntary manslaughter"); *Burger v. State*, 238 Ga. 171, 172 (231 SE2d 769) (1977) (concluding that the trial court's instruction on voluntary manslaughter, part of which may have incorrectly shifted the burden of proof, was harmless because the appellant was not entitled to that instruction in the first place). See also *Redding v. State*, 293 Ga. 766, 768 (749 SE2d 717) (2013) ("Instructional errors that could only benefit a defendant are harmless.").

4. We similarly reject Appellant's claim that his trial

counsel provided ineffective assistance by failing to timely object to the voluntary manslaughter aspects of the verdict form, because Appellant has not proved that any deficiency in his lawyer's failure to timely object likely affected the outcome of his trial. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984); *Ruffin v. State*, 296 Ga. 262, 266 (765 SE2d 913) (2014).

Judgment affirmed. All the Justices concur.

Decided June 3, 2019.

Murder. Spalding Superior Court. Before Judge Sams.

Chaunda F. Brock, for appellant.

Benjamin D. Coker, District Attorney, E. Morgan Kendrick, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.